IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Dennis Barnette, | : | |
| | : | Case No. 1:19-cv-309 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting in Part and Denying in |
| City of Cincinnati, *et al.*, | : | Part Defendants' Motion for Summary |
| | : | Judgment |
| Defendant. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 33). Plaintiff has filed a Memorandum in Opposition (Doc. 36) to which Defendants filed a Reply (Doc. 37). Plaintiff Dennis Barnette is a Caucasian police officer with the City of Cincinnati Police Department. He alleges that Defendants City of Cincinnati, Ohio, Chief of Police Eliot Isaac, and now former City Manager Patrick Duhaney[1] discriminated against him on the basis of his race and violated his due process rights when they suspended his police powers after he referred to a citizen as the N-word while on duty. Defendants deny the claims against them. For the reasons that follow, the Court will **GRANT IN PART AND DENY IN PART** their Motion for Summary Judgment.

## I.        BACKGROUND

### A.        Factual History

#### 1.        CPD Rules

At all times relevant to this lawsuit, Barnette was an officer with the Cincinnati Police Department. He was subject to the Police Department's Manual of Rules and Regulations and

---

[1] Officer Barnette also named the Fraternal Order of Police Local 69 as a defendant in the First Amended Complaint, but only for the limited purpose to have the Court confirm his Arbitration Award. (Doc. 14 at PageID 156.)

Disciplinary Process ("CPD Rules").  The CPD Rules prohibited the following relevant conduct:

> 1.06    A. Members of the Department shall always be civil, orderly, and courteous in dealing with the public, subordinates, superiors and associates.
>
> B. Members of the Department shall avoid the use of coarse, violent, or profane language.
>
> C. Members of the Department shall not express any prejudice concerning race, sex, religion, national origin, life-style, or similar personal characteristics.
>
> * * *
>
> 1.23    A. * * *
>
> B. * * *
>
> C. Members of the Department shall not express, verbally or in writing any prejudice or offensive comments concerning race, religion, national origin, life-style, gender, or similar personal characteristics.

(Case No. 1:19-cv-308, Doc. 31-2 at PageID 400–401.)  The CPD Rules contained a disciplinary matrix.  The discipline for a violation of Rule 1.06(B) was a corrective measure for a first violation, a written reprimand for a second violation, a suspension of up to five days for a third violation, and a suspension of up to seven days for a fourth violation.  (*Id.* at PageID 404–405.) The discipline range for a violation of Rule 1.23(C) was higher.  The matrix provided for a suspension of up to seven days for a first violation, a suspension of up to eleven days for a second violation, and dismissal for a third violation.  (*Id.*)

Police officers were also subject to the City of Cincinnati Administrative Regulation No. 25.  It prohibited comments targeted at individuals based on "age, gender, sexual orientation, gender expression and identity, marital status, disability, religion, race, color, ethnicity, national origin, Appalachian regional ancestry, veteran status, military status, genetic history, or HIV status."  (*Id.* at PageID 411.)

2.      **The Disciplinary Incident**

The incident for which Defendants disciplined Officer Barnette occurred during the overnight hours between December 22–23, 2020 at Brownstone Nightclub, a club with approximately 90% African-American patrons.  (Doc. 30-1 at PageID 256–257.)  Officer Barnette responded to a call about an altercation between two intoxicated patrons of the nightclub, one male and one female.  (*Id.* at PageID 257, 290.)  Officer Barnette approached the female patron and tried to calm her down.  (*Id.* at PageID 258.)  The female patron slapped him, after which time Officer Barnette said to another officer that the "Nigger slapped me in the face." (*Id.* at PageID 260, 262, 290; Doc. 8 at PageID 87.)  Officer Barnette was restraining the female patron when he used the N-word, and he was viewed as speaking in anger.  (Doc. 30-1 at PageID 276.)

Witnesses who heard the slur were shocked and became agitated.  (*Id.* at PageID 258–259, 262, 276.)  Officers testified at the arbitration hearing that although the N-word was commonly used in the African-American neighborhood, the use of the word by a white officer was viewed negatively.  (*Id.* at PageID 260, 264, 273, 283.)  Officers also testified that Officer Barnette was well-liked by his fellow officers and his use of the slur was viewed as out of character.  (*Id.* at PageID 259, 262, 268, 287.)

At least two citizens filed citizen complaints after the incident.  (*Id.* at PageID 266.)  The incident was referred to the Internal Investigations Section for review.  (*Id.* at PageID 265.)  Sergeant Germaine Love watched body camera videos of the incident, reviewed the citizen complaints, and conducted interviews of the officers and citizens at the scene.  (*Id.* at PageID 266–267.)  She wrote an internal investigation report.  (*Id.* at PageID 266.)  She concluded that Officer Barnette had violated Rule 1.23(C) of the Manual of Rules and Regulations which

provides that the police shall not express "prejudice or offensive comments concerning race, religion, national origin, lifestyle, gender, or similar personal characteristics." (*Id.* at PageID 267.)  A purported violation of Rule 1.23(C) required a department level hearing and provided for a 5- to 7-day unpaid suspension.  (*Id.* at PageID 268, 271.)

On December 26, 2021, Sergeant Love, at the instruction of Chief Isaac, suspended Officer Barnette's police powers at the start of her investigation.  (*Id.* at PageID 270, 272.)  He was relieved of his duty weapon, radio, and police identification.  (*Id.* at PageID 270, 302.)  Officer Barnette was not able to work overtime or extra details while his police powers were suspended.  (*Id.* at PageID 294, 302.)  He asked another police officer to accompany him when he had to testify in court because he was concerned for his safety without his badge or weapon. (Doc. 36-1 at PageID 587.)

Sergeant Love said the suspension of police powers was the standard procedure given the "egregious level of the allegation" and because she did not think Officer Barnette would be able to perform job duties in the community given the offensive nature of the N-word.  (Doc. 30-1 at PageID 270.)  Officer Barnette knew other officers had their police powers suspended during investigations of serious issues.  (*Id.* at PageID 297.)  He also agreed that it was within Chief Isaac's "power and discretion . . . to suspend people's police powers."  (*Id.*)  Finally, he agreed that working outside details was a privilege, not a right, and that not everyone volunteered to work outside details.  (*Id.* at PageID 298.)  Likewise, Fraternal Order of Police ("FOP") Local 69 President Daniel Hils agreed that Chief Isaac had "the right and duty . . . to take somebody's police powers when necessary[,]" but he did not always agree with the length of the suspension of police powers or the reasons for it.  (*Id.* at PageID 302–303.)

The department level hearing for the alleged Rule 1.23(C) violation was held before

Captain Aaron Jones.  Captain Jones agreed that Officer Barnette had violated Rule 1.23(C) of the Police Department and City Administrative Regulation No. 25, and he recommended that Officer Barnette receive a 7-day unpaid suspension.  (Doc. 8 at PageID 91.)  The City agreed to the recommendation and imposed the 7-day unpaid suspension.  (Doc. 30-1 at PageID 268.)

Officer Barnette's police powers were reinstated on April 26, 2019, the day he initiated this lawsuit.  (*Id.* at PageID 295.)  However, Officer Barnette's 7-day (56-hour) unpaid suspension was imposed on June 10, 2019 and ran through June 20, 2019.  (*Id.* at PageID 295–296.)  Officer Barnette filed a grievance opposing the 7-day unpaid suspension.  (Doc. 8 at PageID 82.)  A hearing was held before an arbitrator on September 10, 2019.  (Doc. 30-1.)  The arbitrator issued a Decision sustaining the grievance, reducing the 7-day unpaid suspension to a written warning, ordering that he be "made whole" for the unpaid suspension, and ordering that he be "made whole for the extra employment opportunities lost when his Police powers were suspended."  (Doc. 8 at PageID 112.)  The arbitrator based his decision in part on the fact that an African-American Cincinnati police officer, Donte Hill, initially had received only a written warning for using a variation of the N-word[2] while on duty.  The Officer Hill disciplinary situation is summarized immediately below.  (*Id.*, *passim*.)

### 2.    Officer Donte Hill and Other Discipline Matters

At some point after the incident with Officer Barnette on December 23, 2018, Chief Isaac and FOP President Hils became aware that Officer Hill had used a variation of the N-word while on duty in late September 2019, but he was issued only a written reprimand for violating Rule 1.06(B).  (Doc. 30-1 at PageID 301–302.)  Chief Isaac asserted that he made a mistake in

---

[2]  Though much testimony refers to Officer Hill as using the N-word, presumably N***er, Officer Hill insists that he used the term N***a.  He agreed that the use of the term N***er could have been viewed as offensive, but he testified that he was using the term N***a in a non-offensive manner.  (Case No. 1:19-cv-308, Doc. 31-1 at 314–319.)

approving the written reprimand for Officer Hill—that he had not realized that Officer Hill used the N-word in addition to other profane language.  (*Id.* at PageID 302; Case No. 1:19-cv-308, Doc. 31-1 at PageID 241, 243.)  Chief Isaac reopened the disciplinary investigation of Officer Hill and suspended his police powers while the collective bargaining disciplinary process played out.  (Doc. 30-1 at PageID 302.)  Chief Isaac ultimately issued Officer Hill a 7-day unpaid suspension as well.  (Case No. 1:19-cv-308, Doc. 11 at PageID 103.)  Like Officer Barnette, Officer Hill grieved the unpaid suspension under the collective bargaining agreement, and the arbitrator held that the unpaid suspension was improper and had to be removed from Officer Hill's record.  (Case No. 1:19-cv-308, Doc. 7 at PageID 90–91.)  He also has filed a lawsuit pending separately before this Court, *Hill v. City of Cincinnati*, No. 1:19-cv-308 (S.D. Ohio).

Additionally, FOP President Hils testified at Officer Barnette's arbitration hearing about other situations in which police officers were issued only written reprimands despite using racial- or gender-based language that arguably could have been held to have violated Rule 1.23.  (Doc. 30-1 at PageID 305.)  Officer Kevin Brown referred to a domestic violence victim as a "fucking dike ass bitch," and he was given a written reprimand for violation of Rule 1.06(C).  (*Id.* at PageID 305.)[3]  Officer Matthew Thompson, who described an individual as "fruity" and "a girlie man" at a roll call meeting, was given a written reprimand for violating Rule 1.06.  (*Id.*)  Finally, Officer Andrew Fusselman was given a written reprimand for telling an arrestee that he would have understood the need to listen to instructions given by white officers if they had been black. (*Id.*)

---

[3] Rule 1.06(C), like Rule 1.23(C), prohibits expressing prejudice about race, sex, and similar personal characteristics.  (Case No. 1:19-cv-308, Doc. 31-2 at PageID 400–401.)  However, the progressive discipline for a violation of Rule 1.06(C) starts with a written reprimand while the progressive discipline for Rule 1.23(C) starts with a suspension.  (*Id.* at PageID 403–405.)

**B.      Procedural Posture**

Officer Barnette filed this lawsuit against the City of Cincinnati, Chief Isaac, and former City Manager Patrick Duhaney on April 26, 2019 in the Hamilton County, Ohio Court of Common Pleas.  (Doc. 3.)  Defendants removed the case to this Court on April 29, 2019.  (Doc. 1.)  The Court then stayed the matter on May 10, 2019 pending completion of the arbitration. (Doc. 5.)

On July 3, 2020, Officer Barnette filed the First Amended Complaint and a Motion to Confirm Arbitration Award.  (Doc. 14, 15.)  He alleges that the City of Cincinnati, Chief Isaac, and City Manager Duhaney are liable for race discrimination in violation of Ohio Revised Code § 4112.02 and the United States Constitution and for a violation of his substantive and procedural due process rights, both based on the discretionary suspension of his police powers. (Doc. 14 at PageID 159–161.)  As stated in an earlier footnote, Officer Barnette added the FOP Local 69 as a nominal defendant only because it was a necessary party for the Court to confirm the Arbitration Award.  (*Id.* at PageID 156.)  The Court confirmed the Arbitration Award on October 14, 2020.  (Doc. 26.)

Following an unsuccessful mediation and a period of discovery, Defendants filed the pending Motion for Summary Judgment on August 27, 2021.  (Doc. 33.)  The matter is now fully briefed and ripe for adjudication.

**II.      SUMMARY JUDGMENT STANDARDS**

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 585–587 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.    ANALYSIS

Officer Barnette asserts claims for race discrimination and violation of his due process rights against the City of Cincinnati, Chief Isaac, and City Manager Duhaney. He asserts the

claims against Chief Isaac and City Manager Duhaney in their official and individual capacities. The claims against Chief Isaac and City Manager Duhaney in their official capacities are co-extensive with and will be treated the same as the claims against the City of Cincinnati.

## A.    Race Discrimination

Officer Barnette alleges that Defendants discriminated against him on the basis of his race in violation of Ohio Revised Code § 4112.02 and in violation of the United States Constitution.  (Doc. 14 at PageID 159.)  The Fourteenth Amendment states in relevant part that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. 14 § 1.  "A plaintiff asserting a Fourteenth Amendment equal protection claim [for race discrimination] under 42 U.S.C. § 1983 must prove the same elements required to establish a disparate treatment claim under Title VII."  *Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir. 2000); *see also Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (relying on Title VII claims for guidance for a § 1983 equal protection-based employment claim).  Under both statutes, "the plaintiff must establish by a preponderance of the evidence that [he] was the victim of intentional or purposeful discrimination."  *Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir. 1988).  Similarly, the Ohio Revised Code makes it unlawful for an employer "because of the race . . . of any person, to discharge without cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment."  Ohio Rev. Code § 4112.02(A).  Disparate treatment discrimination claims brought under Ohio law are governed by the same standards as federal claims.  *See Woods v. FacilitySource, LLC*, 640 F. App'x 478, 483 (6th Cir. 2016); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d 128, 131 (1981).  Accordingly, the Court will look to Title VII case law to analyze the race

discrimination claims, though Officer Barnette did not plead a Title VII claim.

To set forth a prima facie case of race discrimination using circumstantial evidence, a plaintiff usually must establish the four elements of the well-known *McDonnell-Douglas* test: (1) he is a member of a protected class, (2) he was subjected to an adverse employment action, (3) he was qualified for the position, and (4) he was treated differently than similarly-situated employees outside the protected class. *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016). Officer Barnette seeks to prove a reverse racial discrimination case because he is a member of the racial majority. "In such cases, to satisfy the first prong of the *prima facie* case, the plaintiff must demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Sutherland*, 344 F.3d at 614 (cleaned up). To satisfy the fourth prong, a plaintiff must prove that he was treated differently than a similarly-situated employee in a protected class. *Id.*

If the plaintiff meets his prima facie case, the burden of production shifts to the employer to provide a legitimate nondiscriminatory reason for the adverse action. *Tennial*, 840 F. 3d at 303. Then the plaintiff must rebut the employer's argument by introducing evidence of pretext. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). "The three-part test need not be applied rigidly. Rather, pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (cleaned up). "The trier of fact may consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual." *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (cleaned up).

The Court begins by pointing out that Officer Barnette has presented no argument or evidence upon which City Manager Duhaney could be held individually liable for race discrimination. No facts were presented at the arbitration hearing upon which liability could be based. Officer Barnette has not established that City Manager Duhaney participated in or approved the decision to suspend his police powers. The Court will grant City Manager Duhaney summary judgment on the race discrimination claim made against him in his individual capacity.[4] Thus, the remaining analysis of the race discrimination claims against Defendants pertains only to Chief Isaac, individually, and the City of Cincinnati.

Turning then to the first prong of the prima facie case, Officer Barnette must introduce evidence of background circumstances from which a reasonable factfinder could conclude that the City of Cincinnati and Chief Isaac are the unusual employers who would discriminate against a member of the majority. *See Sutherland*, 344 F.3d at 614 (establishing the standard for reverse discrimination). Officer Barnette argues that the City of Cincinnati faced intense pressure from the media and members of City Council to terminate Officer Barnette because he used the N-word. Sergeant Love testified at the arbitration hearing that the media reported on Officer Barnette's use of the N-word and that the coverage was "not favorable" for anyone. (Doc. 30-1 at PageID 269.) She further testified that she was concerned for Officer Barnette's safety out in the community based on the public reaction to his use of the slur. (*Id.* at PageID 270.) Officer Terrance Dobbins testified at the hearing that he first learned that Officer Barnette had use the N-word because he got text messages from people sending him a link to a media report. (*Id.* at

---

[4] The same analysis and conclusion apply to the due process claim against City Manager Duhaney. Officer Hill has presented no evidence upon which City Manager Duhaney could be held liable for violating his due process rights. In addition, the Court concludes later in the analysis that Officer Hill has not established a violation of his due process rights in any event.

PageID 279.)  Officer Barnette stated in his Declaration that he remembers City Council members demanding that he be fired.  (Doc. 36-1 at PageID 586.)  These facts suggest that Defendants might have felt pressured to impose immediate discipline upon Officer Barnette even though he is a member of the majority.

Turning to the second prong, the parties dispute whether the suspension of police powers constitutes an adverse employment action as a matter of law.  The Sixth Circuit held in 1999 that the suspension of a police chief *with pay* pending a timely investigation did not constitute an adverse employment action.  *Jackson v. City of Columbus*, 194 F.3d 737, 744, 752 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002).  Similarly, the Sixth Circuit stated that "being placed on *paid* administrative leave while an investigation is conducted into suspected wrongdoing is not an adverse action."  *Ehrlich v. Kovack*, 710 F. App'x 646, 650 (6th Cir. 2017) (emphasis added).  On the other hand, the Supreme Court concluded that a jury reasonably had held that an employee suffered an adverse employment action when she was suspended for 37 days *without pay* even though the employer ultimately *reinstated her with backpay* pursuant to a union grievance.  *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 58, 72 (2006) (noting the physical and emotional hardship of having to live for 37 days without income).

Here, Officer Barnette received his salary during the four months his police powers were suspended, but he was denied the opportunity to earn income from overtime and outside details.  Lost opportunity for overtime and outside details can constitute an adverse employment action.  *See Lentz v. City of Cleveland*, 410 F. Supp. 2d 673, 684–685 (N.D. Ohio 2006); *see also Broska v. Henderson*, 70 F. App'x 262, 268 (6th Cir. 2003) ("[A]llegations of a denial of overtime, properly supported, could constitute an adverse employment action.").  The fact that Officer

Barnette was compensated for these lost earnings through the arbitration process is not
dispositive of the issue of whether he suffered an adverse employment action. *See Burlington*,
548 U.S. at 72. The Court concludes that Officer Barnette has created at least a question of fact
for a jury on the adverse action prong.

Defendants do not dispute that Officer Barnette was qualified for his position as a police
officer, so the Court turns then to the fourth prong. Whether individuals are similarly situated
generally is a question of fact for the jury. *See Loesel v. City of Frankenmuth*, 692 F.3d 452,
462–463 (6th Cir. 2012); *JDC Mgmt., LLC v. Reich*, 644 F. Supp. 2d 905, 927 (W.D. Mich.
2009). Officer Barnette must have sufficient evidence to establish that similarly-situated persons
in the protected classes—that is, outside the majority—were treated more favorably. Officer
Barnette asserts that he was treated less favorably than Officers Hill, Brown, Fusselman, and
Thompson, who all were given only written warnings for using prejudicial language. However,
the Court cannot find the fourth prong to be satisfied based on a comparison between how
Officer Barnette was treated versus how Officers Brown, Fusselman, or Thompson were treated
because there is no evidence in the record indicating whether they were white or members of a
racial minority. On the other hand, Officer Hill is African American. Defendants initially
treated Officer Hill more favorably than they treated Officer Barnette because in October 2018
they issued him only a written reprimand for using profane or abusive language despite the fact
that he had used a variation of the N-word while on duty. (Case No. 1:08-cv-308, Doc. 31-2 at
PageID 364–366.) They reconsidered Officer Hill's punishment only after Chief Isaac already
had suspended Officer Barnette's police powers on December 26, 2019. This fact alone is
sufficient at this summary judgment stage to satisfy the fourth prong of his prima facie case.
Officer Barnette has raised an inference of race discrimination by establishing his prima facie

case.

Defendants rely on the explanation for disciplining Officer Barnette provided by Captain Jones in the Department Level Hearing Summary as their legitimate non-discriminatory reason for suspending Officer Barnette's police powers. Defendants expressed concern that Officer Barnette could not be an effective police officer when members of the public were angry at and distrustful towards him based on his use of the N-word. Captain Jones stated that he pointed out to Officer Barnette "the shock and disbelief of those on the scene" when he used the N-word. (Doc. 30-3 at PageID 364.) He also pointed out that some of the civilians on the scene became concerned that Officer Barnette was alone at the scene with the woman whom he had called the N-word. (*Id.*) Officer Barnette acknowledged to Captain Jones that his use of the slur may be used to challenge his credibility when he appears in court. (*Id.* at PageID 365.) These proffered reasons meet Defendants' burden to assert a legitimate non-discriminatory reason for suspending Officer Barnette's police powers pending the formal investigation.

The Court turns then to the issue of pretext. The Court will consider at this stage that Defendants had issued only written warnings to Officers Brown, Fusselman, and Thompson for using offensive race- and gender-based language. This evidence can be viewed as relevant to whether Defendants' stated reasons are a sufficient reason or the actual reason that Defendants suspended Officer Barnette's police powers. *See White*, 533 F.3d at 393 (explaining how pretext can be proven). Plaintiffs assert that a key difference distinguishing Officer Barnette's situation from the earlier situations was the negative reaction that Officer Barnette's use of the N-word generated in the public and the media. Nonetheless, a reasonable jury could conclude that Defendants felt pressure to immediately discipline Officer Barnette while the investigation was pending because he was white, and they did not want the Police Department to be criticized for

condoning racism.  Both this case and Officer Hill's case present tricky factual issues for the

officers and Defendants.  The Court would not hazard a guess whether a jury would find

Defendants liable for racial discrimination in either case.  But Officer Barnette, like Officer Hill

in Case No. 1:08-cv-308, has presented sufficient factual evidence to create disputed issues of

material fact.  The Court will deny summary judgment to the City of Cincinnati and Chief Isaac

in his individual capacity on the race discrimination claims.

## B.      Due Process

Officer Barnette purports to assert both substantive and procedural due process claims

against Defendants pursuant to § 1983.  The Fourteenth Amendment states in relevant part that

no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S.

Const. amend. 14 § 1.  The Court first will examine the substantive due process claim.

The Sixth Circuit has explained substantive due process as follows:

> "The doctrine that governmental deprivations of life, liberty or property are
> subject to limitations regardless of the adequacy of the procedures employed has
> come to be known as substantive due process." *Bowers v. City of Flint*, 325 F.3d
> 758, 763 (6th Cir. 2003) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211,
> 1216 (6th Cir. 1992) (citation omitted)).  These limitations are meant to provide
> "heightened protection against government interference with certain fundamental
> rights and liberty interests."  *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000)
> (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 138
> L.Ed.2d 772 (1997)).  As a result, "Government actions that burden the exercise
> of those fundamental rights or liberty interests are subject to strict scrutiny, and
> will be upheld only when they are narrowly tailored to a compelling governmental
> interest."  *Id.* at 574 (citing *United States v. Brandon,* 158 F.3d 947, 956 (6th Cir.
> 1998)); *see also Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 393 (6th Cir.
> 2005).

*Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007).

The list of fundamental rights entitled to substantive due process protection "is short."

*Id.* (citation omitted).  Fundamental rights include the rights to marry, to have children, to direct

the education and upbringing of one's children, to marital privacy, to use contraception, to bodily

integrity, and to abortion. *Wash. v. Glucksberg,* 521 U.S. 702, 720 (1997). "When reviewing a substantive due process claim, we must first craft a careful description of the asserted right, and then determine whether that right is deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that it can be considered a fundamental right." *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 500 (6th Cir. 2007) (cleaned up).

Officer Barnette has not articulated what fundamental right of his was violated in such a manner as to constitute a violation of substantive due process. At most, he alleges that it violated his substantive due process rights to have his police powers suspended in a racially discriminatory manner. However, "the Supreme Court has held that the concept of substantive due process has no place when another provision of the Constitution directly addresses the type of illegal governmental conduct alleged by the plaintiff." *McClafferty v. Portage Cty. Bd. of Elections*, 661 F. Supp. 2d 826, 834 (N.D. Ohio 2009) (citing *Albright v. Oliver,* 510 U.S. 266, 273 (1994)). It follows that "where the party's substantive due process claim is based on alleged acts of discrimination, that claim should be analyzed under the framework of the Equal Protection Clause rather than as a substantive due process claim." *Id.* (quoting *Fernandez v. City of Pataskala,* No. 2:05-cv-75, 2006 WL 3257389, at *2 (S.D. Ohio Nov. 9, 2006)). This Court has addressed Officer Barnette's race discrimination claims under the Equal Protection Clause above. Officer Barnette cannot separately assert a substantive due process claim based on the race discrimination allegation. The Court will grant summary judgment to Defendants on the substantive due process claim.

The Court turns next to Officer Barnette's procedural due process claim. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth

Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Due process is implicated "when state conduct 'alters a right or status previously recognized by law.'" *Cutshall v. Sundquist*, 193 F.3d 466, 479 (6th Cir. 1999) (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)). "The first step in determining whether procedural due process has been denied is to ask whether there exists a liberty interest or property interest which has been interfered with by the defendants." *Jackson*, 194 F.3d at 749 (internal quotation and citation omitted). "If the court determines that there has been such a deprivation, the remaining question is what process is due." *Id.* "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (internal quotation and citation omitted).

Accordingly, Officer Barnette first must establish that he had a protectable property interest as a prerequisite to proving his procedural due process claim. He has not met this burden. To the extent that Officer Barnette suggests in his brief that his claim is based on the 7-day unpaid suspension, this argument is inconsistent with his allegations in the First Amended Complaint. He alleged therein that "[t]he suspension of Officer Barnette's police powers is an adverse employment action that violates Officer Barnette's Constitutional rights and violates Chap. 4112 of the Ohio Revised Code." (Doc. 14 at PageID 159.) Also, Officer Barnette has not established that the grievance and arbitration procedure did not afford him sufficient due process for the 7-day unpaid suspension.

As for the suspension of his police powers, Officer Barnette has not established that he had a property right to the benefits—overtime and outside details—that he was denied. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it." *Bd. of Regents of State Colls. v.*

*Roth*, 408 U.S. 564, 577 (1972).  Officer Barnette has not proven that he had more than a unilateral expectation to his police powers.  The suspension of a police officer with pay does not implicate due process rights.  *See Jackson*, 194 F.3d at 749.  Moreover, a police officer has no property rights to outside details or overtime earnings if the police department has discretion in approving outside details and overtime.  *See O'Donnell v. City of Cleveland*, 838 F.3d 718, 730–731 (6th Cir. 2016).

Here, FOP President Hils and Officer Barnette both testified at the arbitration proceeding that Chief Isaac had discretion to suspend police powers.  (Doc. 30-1 at PageID 297–298, 302–303.)  The written policy governing "outside employment" for the Cincinnati Police Department states that "[a]ll details require the proper permits and authorization by the Police Chief."  (Doc. 33-1 at PageID 543.)  Officer Barnette, likewise, agreed that working outside details was a "privilege" and not a "right."  (Doc. 30-1 at PageID 298.)  Given these facts, Officer Barnette has not met his burden to establish that he had a property right in the exercise of his police powers.[5]  The Court will grant summary judgment to Defendants on the procedural due process claim as well.

---

[5] Officer Barnette's argument that he would be entitled to non-economic damages—damages for emotional distress and attorney fees—if he proved a due process claim puts the cart before the horse.  He must establish Defendants are liable for violating his right to due process before the damages issue becomes relevant.

IV.     **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.  All Defendants are **GRANTED** summary judgment on Officer Barnette's due process claims.  City Manager Duhaney, in his individual capacity, is **GRANTED** summary judgment on Officer Barnette's race discrimination claims as well.  The City of Cincinnati and Chief Isaac, in his individual capacity, are **DENIED** summary judgment on the race discrimination claims.

**IT IS SO ORDERED.**

BY THE COURT:


S/Susan J. Dlott
Susan J. Dlott
United States District Judge